UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| ERNEST BARNES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 13-CV-1218-MLB-KMH |
| | ) |
| MONSANTO COMPANY, | ) |
| 800 N. Lindbergh Blvd. | ) |
| St. Louis, MO 63167 | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff Ernest Barnes brings this Complaint against Defendant MONSANTO COMPANY ("Monsanto") and states as follows:

1. Plaintiff is a wheat farmer in Morton County, Kansas. He brings this suit because like thousands of wheat farmers from New York to Oregon he has lost money and his livelihood is now at serious risk as a result of Monsanto's negligence or gross negligence.

2. For nearly a decade commencing in 1998, Monsanto tested genetically engineered wheat ("GE Wheat") in fields across the country. It did so knowing full well that release of its experimental seeds into the general wheat population could result in the loss of huge domestic and export markets. Neither the United States nor its trading partners have approved GE Wheat for human consumption. Mixing GE Wheat into non-genetically engineered wheat could make the latter unsalable.

3. In April 2013, the unthinkable happened. An Oregon farmer discovered a strange stand of wheat growing where no wheat had been planted. He

1

applied an herbicide to kill the stand. Shocked when the herbicide proved unsuccessful, he sent the wheat to a lab. There, scientists discovered that the wheat was actually Monsanto's GE Wheat—altered to be herbicide resistant.

4.    International and domestic markets responded to the news swiftly. One day after the media reported the news of the discovery of Monsanto's GE Wheat in unsegregated fields, Japan and South Korea suspended certain U.S. wheat imports. And in the United States, futures prices posted steep declines. Unfortunately, these actions are likely the tip of an iceberg headed straight for the U.S. wheat crop.

5.    Through negligence or gross negligence, Monsanto has released GE Wheat into the non-genetically modified wheat population. Farmers like Plaintiff Barnes have been injured significantly as a result as the price for their wheat drops and markets close previously open doors. Plaintiffs seek damages commensurate with their injury.

## A. PARTIES

6.    Plaintiff is a Kansas wheat farmer who resides in, and owns and operates a wheat farm in, Morton County, Kansas.

7.    Monsanto is a Delaware corporation with its principal office and headquarters at 800 North Lindbergh Boulevard, Saint Louis, Missouri 63167.

8.    Monsanto is an agricultural company in the business of developing, manufacturing, licensing and selling agricultural chemicals, other agricultural products and agricultural biotechnology.

9.     The "original Monsanto" was founded in 1901 to manufacture the synthetic sweetener saccharin.  By 1945, it was actively involved in producing and marketing agricultural chemicals and other agricultural products.  Monsanto also has a lengthy history with agricultural biotechnology.  Scientists working for the original Monsanto were the first to genetically modify a plant cell in the 1980s.  In 1987, the original Monsanto began conducting the first U.S. field trials of plants with biotechnology traits in 1987; and, by 1994, the first biotechnology product of the original Monsanto received regulatory approval.

## B. JURISDICTION

10.     This Court has jurisdiction over the lawsuit under 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000, excluding interests and costs.

11.     Monsanto operates, directly or through its subsidiaries and affiliates, in Kansas such that it is subject to the minimum contacts jurisdiction of the state.

## C. VENUE

12.     Venue is proper in this Court under 28 U.S.C. §1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the State of Kansas, and this is where the property at issue is situated.

## D. CONDITIONS PRECEDENT

13.     All conditions precedent have been performed or have occurred.

### E.  FACTUAL BACKGROUND

14.     Kansas farmers have grown wheat since approximately 1939. Kansas has long been known as the "Wheat State" since Kansas is the nation's leading wheat producer with records of wheat production predating statehood.    Most Kansas wheat farms have been passed down from generation to generation. Kansas wheat is marketed and sold as a commodity domestically and abroad to foreign countries.

15.     Kansas wheat farmers grow non-genetically modified wheat. They do not grow genetically modified wheat for several reasons.  First, it has not been scientifically proven that genetically modified wheat is safe for long-term human and/or animal consumption.  Second, and as a result, many American and foreign consumers will not buy it.   Third, genetically modified traits may spread into and contaminate wild or non-genetically modified wheat varieties and there are no known methods to prevent the unwanted spread of genetically modified wheat. Finally, the adverse affects of growing genetically modified wheat, among other things, is that a wheat farmer's and/or a landowner's crop, land, and future crops are permanently damaged due to the uncontrollable nature of the genetically modified wheat and the unpredictable mutations of the wheat into unknown and unsafe organisms with unknown impacts on the environment and humans.  For these reasons, Kansas wheat farmers have not intentionally planted genetically modified wheat for commercial production.

**Despite Significant Risks, Monsanto Attempts to Develop GE Wheat**

16.     In or around 1998, Monsanto entered into a business endeavor to develop new technology in the wheat industry consisting of new varieties of wheat through developing, planting, and testing experimental, unapproved genetically modified wheat that Plaintiff has come to know as glyphosate-resistant GE Wheat[1] following its discovery on an Oregon farm in 2013. Plaintiff has learned that Monsanto developed, planted and tested GE Wheat from approximately 1998 to 2005. Since Plaintiff is unaware of all of the different "GE" designations assigned to the experimental, unapproved genetically modified wheat, Plaintiff shall refer to Monsanto's genetically modified wheat throughout this Complaint as "GE Wheat," "glyphosate-resistant wheat" and/or "genetically modified wheat." Plaintiff has been harmed by any and all of Monsanto's GE Wheat because it has impacted wheat exports and the price of wheat.

17.     The Animal and Plant Health Inspection Service ("APHIS") is an agency of the United States Department of Agriculture ("USDA") responsible for protecting animal health, animal welfare, and plant health. APHIS is responsible for regulating any and all field trials of genetically modified crops according to the Plant Protection Act ("PPA") codified at 7 C.F.R. § 340, *et seq.* GE Wheat is not currently approved or authorized for commercial sale or planting in any country.

---

[1] In its May 29, 2013 "Statement on USDA GM Wheat Report" found on its website, Monsanto refers to the presence of the "Roundup Ready gene." www.monsanto.com/newsviews/Pages/monsanto-statement-on-usda-gm-wheat.aspx (last accessed on May 30, 2013).

18.     The idea behind Monsanto developing genetically modified lines of wheat was that wheat farmers battle problems with weeds and wild forms of wheat that negatively affect their production and profit.  Monsanto developed GE Wheat and other genetically modified lines of wheat that have a genetically modified protein that allegedly makes the wheat plant resistant to glyphosate, a broad-spectrum herbicide wheat farmers can apply to their crops to kill weeds known to compete with commercial crops without the concern of harming their actual wheat crop.  For example, Monsanto's Roundup is a glyphosate-containing herbicide product.

19.     Monsanto planted its GE Wheat in fields across the United States, including but not limited to Arizona, California, Colorado, Florida, Hawaii, Idaho, Illinois, Kansas, Minnesota, Montana, Nebraska, North Dakota, Oregon, South Dakota, Washington and Wyoming from approximately 1998 to 2005.  Monsanto stored, planted, farmed and/or tested GE Wheat in Kansas.  GE Wheat has always been in the exclusive control, or should have been in the exclusive control, of Monsanto and its agents.

20.     Monsanto's ultimate goal was profit – to develop and sell to wheat farmers a genetically modified variety of glyphosate-resistant wheat along with Monsanto's glyphosate-containing herbicide product systems, the most common of which is Roundup, thus controlling a substantial part, if not all, of the United States wheat market.  In turn, Monsanto would have a monopoly on the United States wheat market that would reap Monsanto potentially billions of dollars.

21.    Following field trials of GE Wheat, Monsanto decided not to commercially market any of its genetically modified wheat and never submitted it to the relevant federal agencies – APHIS, USDA, and/or the Environmental Protection Agency ("EPA") – for commercial approval. Monsanto realized that United States consumers, along with the European and other world markets, did not demand, or even want, genetically modified wheat. As a result, GE Wheat was never approved for cultivation, sale, or human consumption in the United States.

22.    Monsanto also knew that there was a high risk that the genetically modified wheat that was being tested could contaminate other varieties of wheat on Kansas property as well other farms in Kansas by other means. Specifically, Monsanto knew that wheat is a cross-pollinating plant. As such, Monsanto knew that GE Wheat stored, planted, and/or tested on Kansas property and any other property in the United States was likely to cross-pollinate with marketable, non-genetically modified wheat varieties, thereby contaminating these non-genetically modified varieties, permanently mutating them and forever modifying their genetic make-up making the wheat unmarketable. Monsanto failed to keep proper safe zones between fields and failed to utilize other measures such as tarps to prevent the genetically modified wheat from escaping the test areas and cross-pollinating and thereby contaminating fields that were supposed to only contain non-genetically modified wheat.

23.    Monsanto also knew or should have known that GE Wheat could contaminate the non-genetically modified seed wheat including but not limited to in

7

the following ways: 1) Monsanto's failure to prevent birds and/or other natural elements such as wind from transporting genetically modified wheat to fields that were supposed to only contain non-genetically modified wheat to be sold as seed wheat; 2) Monsanto's use of equipment on fields where genetically modified wheat was being planted/grown/tested and then using the same equipment on fields that were supposed to only contain non-genetically modified seed wheat thereby transporting genetically modified wheat and contaminating the supposedly non-genetically modified seed wheat fields; 3) Monsanto's failure to prevent commingling of genetically modified wheat with non-genetically modified wheat during harvest, transport, storage and processing; and 4) contamination caused by volunteer wheat issues. Wheat that voluntarily germinates and develops the year or years after it is initially planted is referred to as "volunteer wheat." Applied here, Monsanto was aware of volunteer wheat issues.

24.    Despite the preceding facts, Monsanto and its agents or employees planted and tested genetically modified wheat on property in Kansas and across the United States. On those same fields, Monsanto knew or should have known that its agents or employees or other farmers would then farm non-genetically modified wheat for the purpose of growing seed wheat to sell to wheat farmers and seed companies that Monsanto knew would ultimately be planted by farmers for commercial wheat production.   Monsanto altogether failed to take proper precautions and/or to prevent the co-mingling of its genetically modified wheat with genetically modified wheat and/or volunteer genetically modified wheat from

germinating, maturing, developing and contaminating what was sold and represented to farmers and seed companies as non-genetically modified seed wheat.

25.    Moreover, Monsanto never properly informed or disclosed to any Kansas wheat farmers, including Plaintiff, that GE Wheat was being stored and/or grown on Kansas soil or anywhere else in the United States.  Monsanto failed to inform Plaintiff and Kansas wheat farmers that seed wheat could be or likely was contaminated with genetically modified wheat.  Monsanto purposely withheld this information because it knew the impact GE Wheat, that it controlled or owned, would have on the wheat market/industry if the public was made aware of the contamination.

### Discovery of Monsanto GE Wheat in Unsegregated Fields

26.    To the best of Plaintiff's knowledge, the contamination of the U.S. wheat supply with Monsanto's glyphosate-resistant gene was first discovered in or around April 2013 by an Oregon farmer who noticed some volunteer wheat plants, plants that had germinated and developed in a place where they were not intentionally planted, in his wheat field.  After discovering the wheat plants, the Oregon farmer attempted to eradicate them by spraying them with a Monsanto's RoundUp glyphosate weed killer. Remarkably, the plants survived the herbicide application.

27.    The Oregon wheat farmer sent samples to a scientist at Oregon State University ("OSU"). The samples were received on April 30, 2013. The scientist at OSU tested the samples and based on preliminary tests, the samples tested positive for a glyphosate-resistant trait.

28.     The OSU scientist contacted APHIS on May 3, 2013.  APHIS immediately began a formal investigation into the situation that included, among other things, dispatching investigators onsite to investigate how this situation occurred and collecting additional samples from the farm in Oregon.  On May 29, 2013, APHIS made the public announcement about this detection as soon as USDA laboratories had absolute confirmation regarding the specific GE glyphosate-resistant wheat variety.

**Discovery of Monsanto GE Wheat Sends the Markets into Turmoil.**

29.     The next twelve months were looking up for this nation's wheat farmers. In November 2012, U.S. Wheat Associates, the nation's international wheat marketing assistance organization, predicted an increased demand in the global wheat markets due to weather issues in Argentina, Russia, and the Ukraine.  Vince Peterson, vice president of overseas operations for U.S. Wheat Associates stated that the 2012-13 marketing year would provide tremendous opportunity for U.S. wheat exports due to the global weather concerns.  With many key competitors unable to provide wheat to their traditional customers, Peterson anticipated the second half of the marketing year would allow the U.S. to export 31.3 million metric tons.  The discovery of Monsanto's GE Wheat in unsegregated fields brought an end to such optimism.  Farmers are now facing sharply declining prices and outright bans on the importation of their wheat in foreign countries.

30.     Once the public became aware of the contamination related to Monsanto's GE Wheat (commonly referred to in the industry as "GMO

contamination"), the response in the wheat markets was swift and negative, thereby damaging the value of Plaintiff's wheat crop and thus the value of the land itself.

31.    According to the Washington Post on May 30, 2013:

Japan, the largest market for U.S. wheat exports, suspended imports from the United States and canceled a major purchase of white wheat on Thursday after the recent discovery of unapproved genetically modified wheat in an 80-acre field in Oregon. The report rattled U.S. wheat markets. In addition to Japan's action, the European Union, which imports more than 1 million tons of U.S. wheat a year, said that it was following developments 'to ensure E.U. zero-tolerance policy is implemented.' It asked Monsanto to help detection efforts in Europe.

32.    South Korea also suspended imports of U.S. wheat according to Reuters on May 31, 2013:

South Korean millers suspended imports of U.S. wheat on Friday and some Asian countries increased inspections after the discovery of the unapproved wheat, but stopped short of imposing import bans.

33.    As set forth above, Monsanto's contamination of the U.S. wheat crop, and Plaintiffs' resulting damages, are not limited to GE Wheat contamination. Wheat seeds, including wheat seeds that have been contaminated with experimental, unapproved genetically modified organisms, are very small and cannot ever be completely removed from farming equipment, buildings, drying/milling/processing facilities, and storage facilities. Wheat farmers, including Plaintiff, use the same farming equipment, buildings, drying/milling/processing facilities, and storage facilities year after year.

34.    As a direct consequence of the acts and omissions of Monsanto with regard to its experimental, unapproved genetically modified glyphosate-resistant wheat, Plaintiff has suffered damages, including but not limited to loss of revenue

relating to the drop in the price of wheat occasioned by the discovery of Monsanto's GE Wheat, economic loss relating to the lack of availability of suitable export markets, and economic losses related to increased farming expenditures resulting from the discovery of GE Wheat.

COUNT I: NEGLIGENCE

35.    Plaintiff incorporates by reference the foregoing paragraphs.

36.    Monsanto owed legal duties to Plaintiff that it breached proximately causing damage to him. First, Monsanto had a duty to prevent injury to Plaintiff when it reasonably appeared or should have appeared that in the exercise of his lawful rights as a product manufacturer and its agent, it created a dangerous condition when creating, testing, handling and storing GE Wheat as described above. Second, it had a duty to exercise reasonable care to avoid a foreseeable risk of injury to Plaintiff and/or a duty to take affirmative action to control or avoid increasing the danger from the improper creation, design, and testing of GE Wheat that was/were created by its conduct.    Third, Monsanto also had a duty to use ordinary care in making representations and in ascertaining the accuracy of information given to Plaintiff. Fourth, it had a duty to exercise reasonable care in performing services that it should recognize as necessary for the protection of Plaintiff and his property. As a product manufacturer and its agent, Monsanto had a duty to use ordinary care in the design, testing, handling and storing of GE Wheat to protect Plaintiff from unreasonable risk of harm. Monsanto failed to use ordinary care in the design, testing, handling and storing of GE Wheat.    The negligent

design, testing, handling and storing was a proximate cause of the harm to Plaintiff. Monsanto is liable for all damages to Plaintiff proximately caused by its actions.

37. Monsanto further had a duty to design, test, handle and store GE Wheat in a manner that would not cause harm or injury to Plaintiff. Monsanto failed to adequately design, test, handle and store GE Wheat or to take appropriate steps to prevent the damage described above. Monsanto's negligent testing was a proximate cause of the harm to Plaintiff. Monsanto is liable for all damages to Plaintiff proximately caused by its actions.

38. A product manufacturer and its agents have a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of the product. A violation of this duty is negligence. Monsanto violated its duty to give a reasonable and adequate warning of the dangers inherent and reasonably foreseeable in the use of GE Wheat to Plaintiff. The inadequate warnings were a proximate cause of the harm to Plaintiff. Monsanto is liable for all damages to Plaintiff proximately caused by its actions.

39. Monsanto further undertook the duty to properly instruct and train those who tested, used, handled, studied, transported, stored, planted and harvested GE Wheat. A product manufacturer and its agent have a duty to give reasonable and adequate instructions with respect to the conditions and methods of its safe use when danger is reasonably foreseeable in its use, unless the danger is known to the user or is reasonably discoverable by him. A violation of this duty is negligence. Monsanto failed to properly instruct and train those who tested, used, handled, studied, transported,

stored, planted and harvested GE Wheat. Monsanto's failure to do so was a proximate cause of the harm to Plaintiff. Monsanto is liable for all damages to Plaintiff proximately caused by its actions.

COUNT II: NEGLIGENT UNDERTAKING

40.     Plaintiff incorporates by reference the foregoing paragraphs.

41.     Monsanto had a duty to act carefully in its testing of GE Wheat, whether the testing was for profit or gratuitous, and should have recognized that its failure to exercise reasonable care in the testing of GE Wheat could result in harm to Plaintiff. Monsanto knew its failure to exercise reasonable care in the testing of GE Wheat increased the risk of harm to Plaintiff. Also, Plaintiff suffered harm due to his reliance, and the reliance of others, on Monsanto's undertaking. Restatement (Second) of Torts § 323 and §324(a).

42.     Monsanto's negligent undertaking proximately caused damages to Plaintiff.

COUNT III: RES IPSA LOQUITUR

43.     Plaintiff incorporates by reference the foregoing paragraphs.

44.     The improper release of GE Wheat by Monsanto was such that it would not have occurred without its negligence because GE Wheat was under its sole management and control. Monsanto designed and manufactured GE Wheat. This would not have occurred without the negligence of Monsanto. Monsanto had exclusive control over GE Wheat. In the ordinary course of business, such a damaging and illegal substance would not escape into the U.S. wheat supply without lack of proper care.

## COUNT IV:  GROSS NEGLIGENCE

45.    Plaintiff incorporates by reference the foregoing paragraphs.

46.    Monsanto's conduct described above was more than momentary thoughtlessness or inadvertence.  Rather, Monsanto's conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff.  Monsanto had actual, subjective awareness of the risk involved but, nevertheless, proceeded in conscious indifference to the rights, safety or welfare of Plaintiff.

47.    At the time it tested GE Wheat, Monsanto knew that wheat can be a cross-pollinating plant.  Monsanto also knew that wheat in the test fields in 1998 through 2005 was likely to cross-pollinate and/or contaminate by other means, non-genetically modified wheat varieties and land, thereby reducing their value by rendering these wheat crops unmarketable or less marketable.  Further, Monsanto knew that scientists since the early 1970s had warned of the danger of contamination of genetically modified organisms in the biotechnology field and that specific precautions had to be taken to prevent the release of genetically modified organisms into the environment.  Monsanto intentionally ignored these concerns.

48.    At that time and through the present-day, Monsanto also knew that non-genetically modified wheat can become contaminated with genetically modified wheat through a wide variety of means including but not limited to cross-pollination, natural events/creatures transporting the contaminated genetically modified wheat from field to field, farm equipment used on a field unknowingly

contaminated with genetically modified wheat and then used on a field with non-genetically modified wheat thereby transporting the genetically modified wheat and contaminating the non-genetically modified field, commingling during harvest, transport, storage and/or processing, and volunteer wheat contamination.

49.    Monsanto also knew that due in part to added costs relating to the segregation of wheat, to insufficient storage capacity, and to the fact that many U.S. grain elevators, storage, and transportation facilities are simply not set up to test and segregate wheat, it could not reasonably expect that those facilities would or could segregate wheat and keep GE Wheat out of the general wheat supply. Monsanto also knew that once GE Wheat contaminated the general wheat supply in the U.S., such contamination would significantly disrupt the storage, transportation, distribution and marketing of wheat, cause significant added costs to wheat farmers, and detrimentally impact the market price for wheat.

50.    Despite this knowledge, Monsanto failed to take adequate, reasonable and necessary precautions to prevent the contamination of the wheat supply with GE Wheat.  Monsanto's acts and omission have caused significant harm to Plaintiff resulting from the GMO contamination, as set forth in the preceding paragraphs.

### COUNT V:  PUBLIC NUISANCE

51.    Plaintiff incorporates by reference the foregoing paragraphs.

52.    Through its conduct alleged above, Monsanto has created a public nuisance by causing widespread contamination of the U.S. wheat supply and wheat

seed supplies with its GE Wheat. This constitutes an unreasonable and substantial interference with rights common to the general public.

53.     This unreasonable interference is imposed on the community at large and on a considerable diverse number of persons and entities. It arises from Monsanto's testing, growing, storage, transportation, disposal, or otherwise dissemination of GE Wheat (a) without adequate precautions to prevent contamination of the U.S. wheat supply; (b) with the knowledge that there was a substantial risk that it would contaminate the U.S. wheat supply; or (c) with the knowledge that there was a substantial risk it would contaminate U.S. and foreign food supplies.

54.     Monsanto has unreasonably interfered with the public's right to expect compliance with the federal laws governing the testing, growing, storage, transportation, disposal, or otherwise dissemination of GE Wheat. Monsanto has further unreasonably interfered with the public's right to expect that wheat sold to the general public is free from contamination with GE Wheat as well as the public right to be notified of whether the wheat sold to the public is contaminated with genetically-modified organisms – including those found in GE Wheat – so that the public has the freedom to choose to purchase and consume non-contaminated wheat.

55.     This interference is unreasonable in that it involves a significant interference with the public health, the public safety, the public peace, the public comfort, or the public convenience. It is also unreasonable in that it is proscribed by

federal and state law, is of a continuing nature, and has produced a permanent or long-lasting effect.

56.   Plaintiff has suffered harm caused by Monsanto's public nuisance distinct from and different than that suffered by the general public in that, as described above, he has suffered business losses.

57.   In light of the surrounding circumstances, Monsanto knew or should have known that its conduct would naturally or probably result in injuries and damages to Plaintiff.   Monsanto nonetheless continued such conduct in reckless disregard of or conscious indifference to those consequences.

### COUNT VI: PRIVATE NUISANCE

58.   Plaintiff incorporates by reference the foregoing paragraphs.

59.   By its conduct alleged above concerning testing, growing, storage, transportation, disposal, or otherwise dissemination of GE Wheat, Monsanto also created a private nuisance.

60.   Plaintiff has property rights and is privileged in respect to the use and enjoyment of the land on which he produces wheat.

61.   Monsanto's contamination of the U.S. wheat supply has unreasonably interfered with, and will unreasonably interfere with and will substantially impair, Plaintiff's use and enjoyment of his interests in the land on which he grows or may grow wheat.

62.     Monsanto's conduct was committed with conscious or reckless disregard of the rights of Plaintiff and was grossly negligent and unreasonable. The gravity of the harm far outweighs the utility of Monsanto's conduct.

63.     As a direct and proximate result of Monsanto's conduct, Plaintiff has sustained substantial injuries and damages, including those alleged above.

64.     In light of the surrounding circumstances, Monsanto knew or should have known that its conduct would naturally or probably result in injuries and damages to Plaintiff.  Monsanto nonetheless continued such conduct in reckless disregard of or conscious indifference to those consequences.

### COUNT VII:  COMMON LAW STRICT LIABILITY IN TORT – ULTRAHAZARDOUS ACTIVITY

65.     Plaintiff incorporates by reference the foregoing paragraphs.

66.     Monsanto's testing, growing, storage, transportation, handling, disposal, or otherwise dissemination of GE Wheat constituted and continues to constitute an abnormally dangerous activity or ultrahazardous activity, because such activities create a high degree of risk of harm, the harm has been and will be significant, the risk cannot be eliminated by the exercise of reasonable care, the activity is not a matter of common usage, the value to the community is outweighed by dangerous attributes, and the activity resulted in injuries and damages to Plaintiff. Further, Monsanto's activity was unduly dangerous and inappropriate for the places where it was conducted.

67.     The type of harm suffered by Plaintiff is the kind of harm the possibility of which makes the activity abnormally dangerous.  As a direct and

proximate result of Monsanto's ultrahazardous or abnormally dangerous activities, Plaintiff has sustained substantial injuries and damages, including those alleged above.

68.    Monsanto is thus strictly liable to Plaintiff for all injuries and damages that have resulted or will result from its abnormally dangerous activities with respect to GE Wheat.

69.    Monsanto knew of the danger and its conduct showed complete indifference to or conscious disregard of the rights of others, including Plaintiff, thereby justifying an award of punitive damages.

COUNT VIII: COMMON LAW NEGLIGENCE *PER SE*

FAILURE TO COMPLY WITH STANDARDS OF CARE IMPOSED BY THE PLANT PROTECTION ACT AND 7 C.F.R. PART 340

70.    Plaintiff incorporates by reference the foregoing paragraphs.

71.    Between 1998 and 2005, Monsanto handled, developed, tested and stored GE Wheat. During the time period relevant to this action, GE Wheat was and continues to be a "regulated article," as defined by 7 C.F.R. § 340.1:

> Any organism which has been altered or produced through genetic engineering, if the donor organism, recipient organism, or vector or vector agent belongs to any genera or taxa designated in Sec. 340.2 and meets the definition of plant pest, or is an unclassified organism and/or an organism whose classification is unknown, or any product which contains such an organism, or any other organism or product altered or produced through genetic engineering which the Administrator, determines is a plant pest or has reason to believe is a plant pest. Excluded are recipient microorganisms which are not plant pests and which have resulted from the addition of genetic material from a donor organism where the material is well characterized and contains only non-coding regulatory regions.

72.     Under 7 C.F.R. § 340.0(a)(1) and (2), no person shall "introduce" a "regulated article" except by permit or pursuant to notification and such introduction "is in conformity with all other applicable restrictions in this part." *See also* 7 U.S.C. § 7711(a), (c); 7 U.S.C. § 7712 (a), (c).

73.     "Introduce" is defined in 7 C.F.R. § 340.1 as meaning "[t]o move in or through the United States, to release into the environment, to move interstate, or any attempt there at." "Move" is defined as "[t]o ship, offer for shipment, offer for entry, import, receive for transportation, carry, or otherwise transport or move, or allow to be moved into, through or within the United States. *Id.* "Release into the environment" is defined as "[t]he use of regulated article outside the constraints of physical confinement that are found in a laboratory, contained greenhouse, or a fermenter or other contained structure." *Id.*

74.     The "applicable restrictions" for "regulated articles" "introduced" in the United States include the following:

(1)     If the plant or plant materials are shipped, they must be shipped in such a way that the viable plant material is unlikely to be disseminated while in transit and must be maintained at the destination facility in such a way that there is no release into the environment.

(2)     When the introduction is an environmental release, the regulated article must be planted in such a way that they are not inadvertently mixed with non-regulated plant materials of any species which are not part of the environmental release.

(3)     The plants and plant parts must be maintained in such a way that the identity of all material is known while it is in use, and the plant parts must be contained or devitalized when no longer in use.

21

(4)   There must be no viable vector agent associated with the regulated article.

(5)   The field trial must be conducted such that:

    i.   The regulated article will not persist in the environment, and
    ii.  No offspring can be produced that could persist in the environment.

(6)   Upon termination of the field test:

    i.   No viable material shall remain which is likely to volunteer in subsequent seasons, or
    ii.  Volunteers shall be managed to prevent persistence in the environment.

7 C.F.R. § 340.3(c).

75.   Monsanto had a duty to comply with the standards of care established by the Plant Protection Act and 7 C.F.R. Part 340, *et seq.* The injuries and damages sustained by Plaintiff as described above, are the type that the Plant Protection Act and 7 C.F.R. Part 340, *et seq.* were designed to prevent, and Plaintiff is among the class of persons that the Act and the regulations were intended to protect.

76.   Monsanto did not comply with the standards of care set by the Plant Protection Act and 7 C.F.R. Part 340, by shipping, planting, maintaining, testing, growing, disposing of, or otherwise disseminating GE Wheat in violation of these regulatory standards, including but not limited to introducing GE Wheat without permit or notification and/or also:

(1)   Not shipping GE Wheat "in such a way that the viable plant is unlikely to be disseminated while in transit";

(2)   Not maintaining GE Wheat "at the destination city in such a way that there is no release into the environment";

(3)   Not planting GE Wheat "in such a way that they [were] not inadvertently mixed with non-regulated plant materials";

(4)   Not maintaining GE Wheat "in such a way that the identity of all material [was] known while in use, and that [the GE Wheat was not] contained or devitalized when no longer in use";

(5)   Not conducting its field tests of GE Wheat "such that (i) [GE Wheat] will not persist in the environment, and (ii) [n]o offspring can be produced that could persist in the environment"; and

(6)   Not terminating the field tests of GE Wheat such that "(i) [n]o viable material shall remain with is likely to volunteer in subsequent seasons, or (ii) [v]olunteers shall be managed to prevent persistence in the environment."

77.   Monsanto breached its duties, as alleged above, breached the requisite standard of care, and was thereby negligent.

78.   As a direct and proximate result of Monsanto's breaches, Plaintiff has sustained substantial injuries and damages, including those alleged above. Monsanto's conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, of which Monsanto was aware, but Monsanto nevertheless proceeded to engage in the conduct with conscious indifference to the rights, safety, or welfare of others – including Plaintiff, thereby justifying an award of punitive damages.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff requests that the Court enter judgment against Monsanto for damages as set forth above in an amount to be proven at trial but in a sum in excess of $100,000, costs of Court, pre-judgment interest at the highest rate permitted by law, post-judgment interest from the date of judgment until paid at the

highest rate permitted by law, and for such other and further relief, both at law or in equity, to which Plaintiffs may be justly entitled.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Wichita, Kansas as the location for the trial of this matter.

## REQUEST FOR TRIAL BY JURY

Plaintiff requests a trial by jury.

Respectfully submitted,

/s/ James C. Dodge
James C. Dodge
Kerry E. McQueen
Isaac L. Diel
SHARP MCQUEEN, P.A.
6900 College Boulevard, Suite 285
Overland Park, Kansas 66211
Telephone: (913) 661-9931
Facsimile: (913) 422-0307
jdodge@sharpmcqueen.com
kmcqueen@sharpmcqueen.com
idiel@sharpmcqueen.com

Stephen B. Murray
Arthur M. Murray
Jessica W. Hayes
MURRAY LAW FIRM
650 Poydras Street, Suite 1100
New Orleans, Louisiana 70130
(504) 525-8100
amurray@murray-lawfirm.com

Martin J. Phipps
GOLDMAN PHIPPS, PLLC
One International Centre
N.E. Loop 410, Ste 1500
San Antonio, Texas 78216
(210) 340-9800
mphipps@goldmanphipps.com

Stephen D. Susman
SUSMAN GODFREY LLP

Richard M. Paul III   KS #17778
Jack D. McInnes V   KS #21898

ssusman@susmangodfrey.com
560 Lexington Avenue, 15th Floor
New York, New York 10022-6828
Telephone: 212-336-8330
Fax: 212-336-8340

Warren T. Burns
wburns@susmangodfrey.com
Terrell W. Oxford
toxford@susmangodfrey.com
Daniel H. Charest
dcharest@susmangodfrey.com
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone: 214-754-1900
Fax: 214-754-1933

PAUL MCINNES LLP
8603 N. Sycamore Dr.
Kansas City, MO 64157
(816) 838-3624
paul@paulmcinnes.com
mcinnes@paulmcinnes.com

Rex A. Sharp
GUNDERSON, SHARP & WALKE, LLP
5301 West 75th Street
Prairie Village, KS 66208
Telephone: 913-901-0505
Fax: 913-901-0419
RSharp@midwest-law.com

ATTORNEYS FOR PLAINTIFF